IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RODNEY K. TADLOCK, ) ) Plaintiff, ) ) v. ) ) UNITED STATES DEPARTMENT OF ) TRANSPORTATION, RAY H. LAHOOD, ) SECRETARY, ) ) Defendant. ) ) | Case No. 12-2148-JAR-JPO |

## MEMORANDUM AND ORDER

Plaintiff, proceeding pro se, filed this case on March 9, 2012, alleging claims of retaliation under the Rehabilitation Act of 1973[1] against his former employer, Defendant Department of Transportation. This case is presently before the Court on Defendant's Motion to Dismiss or in the Alternative for Summary Judgment (Doc. 16). The motion is fully briefed and the Court is prepared to rule. As explained more fully below, the Court finds Defendant's motion to dismiss is moot and grants its motion for summary judgment.

**I.     Motion to Dismiss**

Defendant moves to dismiss under Fed. R. Civ. P. 12(b)(1), to the extent Plaintiff asserts claims in this case that were not administratively exhausted. It is undisputed that Plaintiff exhausted his administrative remedies for the following three retaliation claims: (1) denial of his request of October 16, 2007, for a shift change on October 17, 2007; (2) a medical records request in November 2007; and (3) constructive discharge in December 2007.

The Court lacks subject matter jurisdiction over Rehabilitation Act claims that are not

---
[1] 29 U.S.C. §§ 701–796l.

included in the EEOC charge because the exhaustion of administrative remedies is a jurisdictional prerequisite to the filing of a lawsuit, similar to Title VII.[2] "[E]ach discrete incident of [discriminatory] treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted."[3] While the Court agrees with Defendant that it lacks jurisdiction over any discrete incident of discriminatory treatment that Plaintiff alleges outside of the three listed in his EEOC charge, this issue appears to be moot. Plaintiff's Complaint specifically lists those three incidents, and he concedes in his response to the motion that his claims are limited to those presented in the administrative case.[4] To the extent Plaintiff contends otherwise, those claims must be dismissed for lack of jurisdiction.

## II.     Request for Additional Discovery

In his response to the motion for summary judgment, Plaintiff asserts at various times that further discovery should be permitted, which would yield evidence to support his claims. Under Rule 56(d), if a nonmovant states by affidavit that he cannot present facts essential to oppose a motion for summary judgment, the Court may, "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."[5] The decision whether to grant a Rule 56(d) motion lies within the

---

[2]*Woodman v. Runyan*, 132 F.3d 1330, 1341 (10th Cir. 1997); *Johnson v. Orr*, 747 F.2d 1352, 1356 (10th Cir. 1984).

[3]*Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

[4]In his response, Plaintiff later argues that he discovered more instances of retaliation during the course of the administrative proceeding, and indicates that if "I filed a retaliation claim every time I was illegally discriminated against in 2007, it would have taken up an incredible amount of my time." Pl. Resp. Memo. at 14 (Doc. 21). But he concedes that these other claims were not administratively exhausted. The Court only considers Plaintiff's claims for the retaliatory incidents for which he filed an EEOC charge.

[5]Fed. R. Civ. P. 56(d); *Price v. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000).

sound discretion of the court.⁶ The nonmovant must satisfy several requirements to obtain relief under Rule 56(d). By affidavit, he must explain: (1) why facts precluding summary judgment are unavailable; (2) what probable facts he can find through further discovery; (3) what steps he has taken to obtain such facts; and (4) how additional time will allow him to controvert facts.⁷ "A party may not invoke Rule 56[d] by simply stating that discovery is incomplete but must state with specificity how the additional material will rebut the summary judgment motion."⁸

The Court declines to allow Plaintiff additional time to seek discovery under this provision of Rule 56. He has not filed an affidavit setting forth the information he may be able to find through additional discovery. This is significant in this case because Plaintiff has access to a lengthy administrative record containing the relevant documents in this case, including the transcript of testimony by key witnesses. It is incumbent upon Plaintiff to set forth some showing for the Court of the facts he seeks to discover, if any, in opposing summary judgment, and he has wholly failed to do so in this case; he simply states that discovery is incomplete. To the extent Plaintiff requests relief under Rule 56(d), it is denied.

## III. Summary Judgment Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law."⁹ A fact is only material under this standard if a dispute over it would affect the outcome of the suit.¹⁰ An

---

⁶*Jensen v. Redevelopment Agency*, 998 F.2d 1550, 1553–54 (10th Cir. 1993).

⁷*Price*, 232 F.3d at 783 (quoting *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992)).

⁸*Garcia v. United States Air Force*, 533 F.3d 1171, 1179 (10th Cir. 2008) (quotation omitted).

⁹Fed. R. Civ. P. 56(a).

¹⁰*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[11] The inquiry essentially determines whether trial is needed or whether the evidence "is so one-sided that one party must prevail as a matter of law."[12]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[13] When examining the underlying facts of the case, the court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[14]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[15] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[16] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[17] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated

---

[11]*Id.*

[12]*Id.* at 251–52.

[13]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[14]*See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[15]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

[16]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[17]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)); *see Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

therein."[18] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[19] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[20]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[21] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[22]

Because Plaintiff proceeds pro se, some additional considerations frame the Court's analysis. The court must construe his pleadings liberally and apply a less stringent standard than that which is applicable to attorneys.[23] However, the court may not provide additional factual allegations "to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[24] Additionally, a pro se litigant is not excused from complying with the rules of the

---

[18]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).

[19]Fed. R. Civ. P. 56(c)(4).

[20]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[21]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[22]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[23]*Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[24]*Id.*

court and is subject to the consequences of noncompliance.[25]

This last rule applicable to pro se litigant filings is at issue on this motion. While Plaintiff has substantially complied with the Court's local rule on responding to Defendant's statements of uncontroverted fact by reference to each numbered paragraph, and by submitting his own additional statements of fact, he has largely failed to support his factual assertions with admissible evidence. Plaintiff cites his Complaint and the exhibits attached thereto as support for the vast majority of his factual assertions. But as the Court has explained, a party may not simply rely on his pleadings in opposing summary judgment, unless the Complaint is verified and meets the requirements of Fed. R. Civ. P. 56(c)(4).[26]

Plaintiff filed a form Complaint,[27] as well as a narrative Complaint to which he attached several exhibits.[28] Neither document is verified—they are not signed under penalty of perjury or notarized.[29] Moreover, many of the statements contained in Plaintiff's narrative pleading are not based on personal knowledge, but instead, on mere belief. Instead, the document is replete with conclusory allegations, hearsay, and statements of mere belief. Even if the document was verified, the Court would find such statements to be inadmissible. So the Court finds that

---

[25]*Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994) (citing *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (insisting that pro se litigants follow procedural rules and citing various cases dismissing pro se cases for failure to comply with the rules)).

[26]*Conaway v. Smith,* 853 F.2d 789, 792 (10th Cir. 1988) ("Although a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e)").

[27]Doc. 1.

[28]Doc. 2. Plaintiff repeatedly objects to Defendant's citations to "Doc. 2." This citation refers to the Docket Entry Number for the document in this case. Doc. 2 in this case is the same document that Plaintiff refers to as his Complaint. Because this is a document compiled and submitted for filing by Plaintiff, his objection that he did not receive something called "Doc. 2" is overruled and denied.

[29]*See* 28 U.S.C. § 1746.

Plaintiff's statements of fact supported merely by the narrative portion of his Complaint are insufficient to controvert the facts set forth in Defendant's motion for summary judgment. To the extent Plaintiff supports his factual statements with the exhibits attached to the Complaint, however, the Court will consider the statements, as Defendant also relies on these documents in its motion. And the Court will consider statements that Plaintiff can support with the admissible evidence submitted by Defendant along with its summary judgment motion. The Court notes however, that Defendant did not submit the entire record from the administrative proceeding, so some of the documents cited by Plaintiff are not included in the record and therefore are not considered by the Court.

### IV. Uncontroverted Facts

As set forth above, the Court deems many of the material facts set forth in Defendant's motion admitted for the purposes of summary judgment because Plaintiff failed to specifically controvert them with admissible evidence in the record as required under Fed. R. Civ. P. 56(c) and (e), and D. Kan. Rule 56.1(a) and (d).

Plaintiff worked for the Federal Aviation Administration ("FAA") as an air traffic control specialist from April 29, 1986, until his retirement on December 28, 2007. He worked at the Air Route Traffic Control Center ("ARTCC") in Olathe, Kansas ("Kansas City Center"). The FAA employs over 44,000 people; it creates and enforces regulations regarding the safety and security of airline passengers, pilots, crew, cargo, and anyone else affected by air travel. Air traffic control specialists are responsible for the "safe, orderly, and expeditious flow of air traffic."

Air traffic controllers' employment terms are governed by a collective bargaining agreement negotiated between the FAA and the National Air Traffic Controllers Association

("NATCA"). At the time of the events relevant to this case, the June 5, 2006 contract between NATCA AFL-CIO and the FAA ("Contract") governed many of the policies and procedures in place.[30] Air traffic controllers' major duties at the ARTCC include controlling and separating en route traffic along airways and over the oceans; controlling aircraft to and from non-approach controlled airports; operating automated radar systems; obtaining important control data; detecting malfunctions in the radar system; providing advisories to aircraft on weather, navigation, airport conditions, and restrictions; and providing training to developmental air traffic controllers and other employees, among other duties.

Given these duties, the FAA policy with regard to the health and safety of its air traffic controllers is as follows:

> It is in the interest of the agency to develop and maintain the best possible Air Traffic Control Specialist Workforce. This goal requires the development and operation of a health program that will ensure optimal selection of ATCSs and promote retention of experienced employees in the system without compromising air safety. It is the policy of the agency to apply medical standards and medical state-of-the-art technology concurrent with effective management to achieve these objectives. When an ATCS experiences health problems, it is agency policy to utilize the employee in the performance of productive air traffic work as long as safety is not affected.[31]

While there is no specific list of medical procedures or medications that must be cleared by the flight surgeon, there is a set of guidelines that must be followed. Initially, any medication by an air traffic controller except for "innocuous medications" must be disclosed to the medical staff. Such innocuous medications include aspirin derivatives, nose drops, vitamin preparations, skin

---

[30]Doc. 22, Ex. 4.

[31]Doc. 17, Ex. 6, sec. 6.

8

ointments, and routine immunizations. Restricted drugs include sedatives or sedative type drugs, tranquilizers, and "any other drug and/or medication likely to affect the alertness, judgment, vision, equilibrium, or a state of consciousness" of the air traffic controller. If an air traffic controller is advised by a physician that treating an ailment will require the use of such medication, then the employee shall not perform control duties. If the period of treatment lasts more than two (2) weeks, the controller should obtain the opinion of the flight surgeon.

On November 17, 2006, Plaintiff filed an EEO complaint against the FAA, claiming discrimination on the basis of age and disability—chronic sinusitis.

On January 2, 2007, Plaintiff underwent a procedure to correct his sinusitis. He had previously undergone surgery in December 2005 to treat his chronic sinusitis. On January 8, 2007, his ENT surgeon, Dr. Ellis, reported to the FAA that Plaintiff was able to return to work with restrictions on January 17. On January 16, the Regional Flight Surgeon, Dr. Larry Wilson, reviewed Plaintiff's medical file in response to an inquiry about Plaintiff's chronic disability. At that time, the only other information in Plaintiff's file were reports from 2005 about Plaintiff's sinusitis. On January 17, FAA Nurse Constance Rudder cleared Plaintiff to resume his duties as an air traffic controller.

In March 2007, Plaintiff returned to Dr. Ellis because he noticed a drip of fluid from his nose when he bent forward. Dr. Ellis diagnosed it as a Cerebral Spinal Fluid ("CSF") leak. On April 2, 2007, Dr. Ellis placed Plaintiff on a "Prednisone Pak." On April 9, 2007, Plaintiff returned to Dr. Ellis because the Prednisone Pak had not sealed the CSF leak, so Dr. Ellis treated Plaintiff with silver nitrate and again prescribed Prednisone. Plaintiff returned to Dr. Ellis again on April 23 because the CSF leak was not sealed; Dr. Ellis gave Plaintiff a Zyplast Collagen

9

injection. On April 24, Dr. Ellis submitted a report to the FAA stating, among other things, that Plaintiff had a slight leak of CSF on the left side of his nose. Nurse Rudder received this report, but at the time, she did not notice the CSF leak notation and did not inform Dr. Wilson.

Air traffic controllers are routinely observed for performance evaluations, both remotely and directly, in a system of rounds, in which every controller is observed once, and then restarting the process on a continuous basis. When an air traffic controller makes an error on an "emphasis" item, on four or more "standard" items, or makes an error also made in a previous observation, the Front Line Manager must consult with the operations manager to determine what, if any, corrective actions must be taken. If corrective action is deemed necessary, the Front Line Manager is responsible for conducting that action. In 2007, most controllers were evaluated in this manner three or four times during the year, not including any follow up observations or other actions taken as a result of errors made during the routine evaluations.

Plaintiff was subject to routine, remote observations on three dates in 2007: April 5, June 12, and September 5, 2007. While each of these observations resulted in certain errors that required follow up observations, his performances during those follow up observations were always at least satisfactory.

On October 16, 2007, Plaintiff learned that the day shift for the following day was short one controller. He requested a shift change to fill the open day shift slot; the request was denied. Due to staffing concerns, Plaintiff's Front Line Manager, Troy Price, was required to look internally at other day shift controllers to fill the open slot, so he denied Plaintiff's shift change request. Price also denied two other formal shift change requests on October 16 for the following day. Instead, Price asked a less senior controller, Grant Rodebush, to move up his

shift on October 17 from 8:00 a.m. to 6:00 a.m. Had Plaintiff's shift change been granted, Price would have been one controller short on the night shift and an unscheduled controller would have been called in, necessitating overtime. The Contract states that a manager must approve a shift change unless doing so would result in overtime. The Contract also states that shift changes should be denied if staffing needs for the affected shifts will not be met if the request is approved. On October 16 and 17, 2007, Price had no knowledge of Plaintiff's EEO action.

On October 8, 2007, FAA legal counsel Mary Ellen Loftus received interrogatories and requests for production of documents from Plaintiff's attorney, Mark Esher, for the 2006 EEO administrative case. One of these requests for production sought copies of documentation relating to any of Plaintiff's medical conditions since 2003. Loftus visited with Dr. Wilson on November 8, 2007, about the discovery requests. Dr. Wilson called and asked Nurse Rudder for Plaintiff's medical file to be turned over to Plaintiff in response to the discovery requests, if and when Plaintiff executed an authorization to release that information. During their phone call, Nurse Rudder indicated to Dr. Wilson that there was a notation in the medical file about Plaintiff's CSF leak. Nurse Rudder testified during the administrative hearing that this was the first time that she noticed the April notation about the CSF leak.

On November 15, 2007, Nurse Rudder sent Plaintiff a letter with Dr. Wilson's approval, seeking records about the CSF leak, Plaintiff's sinus surgeries in 2005 and 2007, and his chronic sinusitis condition. She asked that Plaintiff provide the requested documents by December 5, 2007. But Plaintiff left for vacation in November until around Christmastime and was therefore unable to respond to Nurse Rudder's requests by December 5. He responded by letter on November 28, stating that he did not believe there was a medical reason for the document

11

request and that the request was unreasonable in scope. He indicated that the CSF leak had stopped.

On December 3, 2007, Plaintiff left Dr. Wilson a voice mail message in which he disclosed that he had been placed on the prescription drug Zolpidem, also known as Ambien. Eventually, Dr. Wilson spoke to Plaintiff and told him that he was deemed "incapacitated." Nurse Rudder followed up with a letter to Plaintiff that same day, informing him that he was "medically incapacitated," a temporary status, until further notice. On December 4, Dr. Wilson sent a formal letter to the ARTCC facility manager, advising him that Plaintiff was medically incapacitated and unable to work safety-related duties.

On December 11, 2007, Nurse Rudder sent a letter to Plaintiff on behalf of Dr. Wilson, clarifying the scope of the requests made in the November 15 letter. She explained that they only needed medical files relating to his 2005 and 2007 sinus surgeries, his chronic sinusitis, his CSF leak, and his use of Zolpidem. She advised that once these documents were received, Dr. Wilson could make a medical decision regarding his incapacitation status. In this December 11 letter, Dr. Wilson indicated that Plaintiff had been cleared for his "sinus problem," but not for the CSF leak because the medical file had no information about this problem.

On December 17, 2007, Plaintiff submitted an application for immediate retirement and on December 28, he was granted voluntary early retirement.

## V. Discussion

Plaintiff brings three retaliation claims under the Rehabilitation Act: (1) denial of his request of October 16, 2007, for a shift change on October 17, 2007; (2) a medical records request in November 2007; and (3) constructive discharge in December 2007. He claims that all

12

three of these actions were in retaliation of his November 2006 EEO claim. Plaintiff does not submit direct evidence of retaliation; his evidence is circumstantial.[32] While the Retaliation Act does not explicitly prohibit retaliation, it incorporates by reference the anti-retaliation provision of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a).[33] Plaintiff can establish retaliation based on circumstantial evidence under the *McDonnell Douglas* burden shifting framework.[34]

To establish a prima facie case of retaliation, Plaintiff must show: "'(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action.'"[35] If the plaintiff can establish a prima facie case, the burden shifts to the employer to offer a legitimate, nonretaliatory reason for its decision.[36] Once the employer has satisfied this burden of production, the plaintiff must show that the employer's proffered reason is merely a pretext for retaliation.[37]

### A. October 2007 Denial of Shift Change

Plaintiff's first claim of retaliation is that Price denied his request for a shift change on October 16, 2007, in retaliation for Plaintiff's 2006 EEO complaint. Defendant moves for

---

[32]*See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (discussing the difference between direct/mixed motive and circumstantial/pretext retaliation cases).

[33]42 U.S.C. § 794(d).

[34]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *see Jarvis v. Potter*, 500 F.3d 1113, 1125 (10th Cir. 2007).

[35]*Id.* (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003)).

[36]*Twigg*, 659 F.3d at 998 (citing *Somoza*, 513 F.3d at 1211).

[37]*Id.*

13

summary judgment on the grounds that he cannot establish a prima facie case of retaliation because the shift change does not constitute an adverse employment action, and because Price had no knowledge of Plaintiff's EEO complaint at the time of the shift change.

In order to constitute an adverse employment action, "the employer's conduct must be 'materially adverse' to the employee's job status."[38] Job duty assignments are neither automatically actionable nor categorically non-actionable.[39] Each case must be "'judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'"[40] The Court looks at whether there is objective evidence of "material disadvantage," and the inquiry does not "turn on a plaintiff's personal feelings" about the circumstances of the case.[41]

Here, the Court agrees that there is no objective evidence in the record of material disadvantage associated with the October 16, 2007 denial of shift change. Price's denial did not affect Plaintiff's job status or pay. Plaintiff offered no admissible evidence that working the day shift on October 17, 2007, was objectively preferable, only that it was a temporary reassignment that he subjectively preferred. Moreover, there is no evidence of causal connection—the undisputed evidence shows that Price was unaware of Plaintiff's EEO complaint when he denied the shift change request.[42] While Plaintiff suggests that Price was not truthful when he testified accordingly at the administrative hearing, such conclusory assertions are insufficient to create a

---

[38]*Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003).

[39]*Semsroth v. City of Wichita*, 555 F.3d 1182, 1185–86 (10th Cir. 2009).

[40]*Id.* (quoting *Burlington N. Ry. v. White*, 548 U.S. 53, 71 (2006)).

[41]*Id.*

[42]*See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) .

genuine issue of material fact.

Even if Plaintiff could make out a prima facie case with regard to this claim, he is unable to show that the FAA's nonretaliatory explanation is unworthy of credence. Defendant explains that Price did not grant Plaintiff's shift change request due to staffing concerns and because it would have created an overtime situation during the night shift, contrary to the Contract that governed the terms of air traffic controllers' employment. Plaintiff argues that this explanation is pretextual because there is evidence of fewer than ten controllers working the night shift on other occasions with no overtime. The admissible, uncontroverted evidence establishes that Price was required to look at other day shift controllers to fill the open slot for the October 17 day shift, which is why he denied Plaintiff's shift change request along with two other shift change requests that day. Instead, Price asked a controller who was already scheduled to work at 8:00 a.m., to move his shift up to 6:00 a.m. Had Plaintiff's shift change been granted, Price would have been one controller short on the night shift and an unscheduled controller would have been called in, necessitating overtime. Plaintiff has failed to come forward with evidence that would establish a genuine issue of material fact about whether the FAA's nonretaliatory reason for denying his shift change was a pretext for retaliation.

### B. Request for Medical Records

Plaintiff's second claim is that the FAA's request for medical documents in November 2007 was retaliatory, that it was designed to harass him. Defendant argues that this claim fails because the request for medical records does not constitute an adverse employment action and that his incapacitation was required by FAA policy and cannot, therefore, be considered retaliatory.

The Court agrees that Plaintiff cannot establish a prima facie case of retaliation on this claim because the request for medical records was not an adverse employment action. The request was triggered by Plaintiff's own discovery requests during his administrative case, and there is no evidence that the request itself materially changed the terms or conditions of his employment, even though the information discovered within those documents led to his temporary incapacitation. To the extent Plaintiff claims that the request itself was unwieldy and thus retaliatory, the scope of the request was later clarified by Nurse Rudder in response to Plaintiff's November 28 letter. Nurse Rudder made clear that they only needed medical files relating to his 2005 and 2007 sinus surgeries, his chronic sinusitis, his CSF leak, and his use of Zolpidem.

To the extent Plaintiff argues that the act of deeming him medically incapacitated is itself retaliatory, this claim fails as well.[43] Plaintiff has come forward with no evidence suggesting that the FAA's legitimate nonretaliatory explanation for that decision was pretextual. The policies and procedures that apply to air traffic controllers make clear that most medications are disallowed without clearance by the flight surgeon. Dr. Wilson learned in November 2007 about the CSF leak, for which Plaintiff was proscribed various medications earlier in the year that had not been cleared. Dr. Wilson also learned on December 3, 2007, that Plaintiff was currently taking a restricted sleep aid medication—Plaintiff does not deny this, and in fact, suggests he was only prohibited from taking this medication within a 24-hour period before assumption of

---

[43] As discussed in Part I, this claim was not exhausted and therefore the Court lacks jurisdiction. Plaintiff purports to controvert the evidence that he was deemed temporarily incapacitated by arguing that he was disqualified, a permanent status. But the only evidence of this is his own statement in the unverified Complaint that Dr. Wilson told him he was disqualified during the December 3, 2007 phone call. Dr. Wilson denied this in his testimony, and in an affidavit, and maintains that he told Plaintiff he was incapacitated. Nurse Rudder's follow-up letter reiterated to Plaintiff that he was considered temporarily incapacitated, not disqualified.

16

duty.  Given these undisputed facts, there is no genuine issue of material fact that the FAA's reason for placing Plaintiff on temporary incapacitation status was the true reason, and not a pretext for unlawful retaliation.

### C.     Constructive Discharge

"Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. . . .  The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant."[44]

> The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions. Further, conduct which meets the definition of a "tangible employment action" or an "adverse employment action" is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable.[45]

Plaintiff argues in his response that he was "disqualified" by Dr. Wilson for his use of a sleep aid medication, a status that effectively ends an air traffic controller's career.  But there is no evidence in the record that Plaintiff was ever disqualified, and Plaintiff's statements to the contrary are inadmissible.  The only evidence in the record supports Defendant's version of events—Dr. Wilson did not learn about the CSF leak or Ambien use until November and December 2007, after reviewing Plaintiff's medical files in order to respond to Plaintiff's own discovery requests.  After learning this information, pursuant to the FAA's guidelines, Dr.

---

[44]*Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (quotations omitted).

[45]*Tran v. Tr. of State Coll. in Colo.*, 355 F.3d 1263, 1270–71 (10th Cir. 2004) (citations omitted).

17

Wilson placed Plaintiff in a temporary "incapacitation" status, while he collected and reviewed Plaintiff's medical records. The follow up letters to Plaintiff and the ARTCC both corroborate Dr. Wilson's testimony on this subject.

The Court has already found that neither the shift change request in October 2007, nor the medical records request in November 2007, amounted to an adverse employment action. Plaintiff argues that these events, in addition to his repeated observations and evaluations, suggest that his working conditions were so intolerable that he had no other choice but to retire. But there is no genuine issue of material fact about whether Plaintiff's working conditions were objectively intolerable. Plaintiff clearly had another reasonable choice other than retiring, he could have returned to work in an administrative capacity and waited for the results of Dr. Wilson's medical investigation.

Because Plaintiff cannot establish a genuine issue of material fact that he was retaliated against under the Rehabilitation Act under any of the three theories he administratively exhausted, Defendant's motion for summary judgment must be granted.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Dismiss or in the Alternative for Summary Judgment (Doc. 16) is **granted**.

**IT IS SO ORDERED**.

Dated: March 6, 2013

                                                S/ Julie A. Robinson
                                                JULIE A. ROBINSON
                                                UNITED STATES DISTRICT JUDGE